**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-CV-80628-ROSENBERG**

NEW HAMPSHIRE INSURANCE
COMPANY, as subrogee and assignee
of ½ BARRELL LLC,

       Plaintiff,

v.

LOGAN MARINE & INDUSTRIAL
DIESEL LLC,

       Defendant.

_____/

## MEMORANDUM OPINION

**THIS CAUSE** is before the Court following the non-jury trial held on April 23 and 24, 2024. This case arises from Plaintiff New Hampshire Insurance Company's subrogation claim against Defendant Logan Marine & Industrial Diesel LLC for damages caused by Defendant's alleged improper repair to the port engine of the insured vessel, ½ Barrell. In its Amended Complaint, Plaintiff brings three claims against Defendant under admiralty law: (1) breach of contract, (2) breach of the warranty of workmanlike performance, and (3) negligence. *See* DE 7. Defendant contests both liability and the amount of damages Plaintiff seeks. *See* DE 15.

## I.     INTRODUCTION

The Court first briefly summarizes the undisputed background facts before examining the testimony of each witness.

### A.    Undisputed Facts

The following facts are not disputed by either party, per the Pretrial Stipulation at docket entry 54.

*i.*       *The Parties and the Vessel*

The vessel at issue in this case is the Motor Yacht ½ Barrell ("the Vessel"), owned by ½ Barrell, LLC, which is managed by Van Palmer Finger, III. DE 54 at 3.  The Vessel is a 2007 64' convertible sport fishing boat manufactured by Viking. *Id.*  Finger hired Captain Kyle Weaver in 2018 as a full-time captain to operate the Vessel. *Id.*  The Vessel left on a trip to the Bahamas on December 28, 2022. *Id.* at 4.  On December 31, 2022, while underway in Bahamian waters, water entered the Vessel's engine room ("the Incident"). *Id.*

Defendant Logan Marine & Industrial Diesel LLC is a limited liability company doing business in Palm Beach County, Florida, repairing and servicing boats and marine equipment. *Id.* at 3.  Defendant serviced the Vessel between 2021 and 2022, before the Vessel sailed to the Bahamas. *Id.* at 3-4.

At all material times, Plaintiff New Hampshire Insurance Company insured ½ Barrell, LLC, and thereby the Vessel, pursuant to Policy No. YM 1 993-39-37. *Id.* at 3.  After the Incident, ½ Barrell, LLC presented a claim for damages to Plaintiff. *Id.* at 4.  Plaintiff paid for the damage to the Vessel. *Id.*  ½ Barrell, LLC executed a Subrogation Agreement/Assignment of Rights in favor of Plaintiff. *Id.* at 5.

*ii.*      *The Service Work*

The following work was performed by Defendant on the Vessel between 2021 and 2022:

a. 4000 Hour Service - port and starboard main engines;
b. Replacement of raw water pumps - port and starboard main engines;
c. Replacement of exhaust temperature sensor - starboard main engine;
d. Removal, rebuilding and replacement of turbochargers - port and starboard main engines;
e. Removal and replacement of heat exchangers and replacement of all seals - port and starboard main engines;
f. Removal and replacement of upper riser exhaust hose and its clamps - port main engine;
g. Removal and replacement of charge air cooler, clean and pressure test - port and starboard main engines;

2

      h. Removal and replacement of oil cooler, cleaned and pressure tested - port and starboard main engine;

      i. Replacement of thermostat - starboard main engine.

*Id.* at 3-4.  The Vessel was in the water at Loggerhead Marine in Palm Beach County when Defendant commenced work on the 4,000-hour service on November 19, 2021. *Id.* at 3.  Because of a shortage of parts, work on the turbochargers only began on August 4, 2022. *Id.* at 4.  Defendant replaced the port engine's upper exhaust hose on October 12, 2022.  For all work performed, Defendant was paid $170,719.61. *Id.*

      *iii.*    *The Incident, Damages, and Cost to Repair*

On December 31, 2022, water entered the engine room while the Vessel was in Bahamian waters. *Id.*  Captain Weaver activated the crash pumps to suck the water out of the engine room. *Id.*  After the incident, the Vessel was taken for repairs to Willis Custom Yachts in Stuart, Florida. *Id.*  ½ Barrell, LLC presented a claim for damages to Plaintiff. *Id.*  For the damage to the Vessel, Plaintiff paid ½ Barrell, LLC a total of $276,820.65. *Id.*  ½ Barrell, LLC retained a deductible of $14,350. *Id.*

    **B.**    <u>**Lay Testimony About the Incident**[1]</u>

The Court now discusses the lay testimony given during the trial, which provided further detail about the service work performed and the Incident.

      *i.*    *Deposition of Captain Kyle Weaver*

The Court reviewed the deposition of Kyle Weaver outside of trial time.  Below is the relevant testimony from that deposition.

---

[1] Although not discussed below, the Court reviewed a video deposition of Palmer Finger, the owner of the Vessel, but does not find his testimony relevant to the germane issue in this case: whether Defendant improperly or negligently repaired the Vessel.

a.      Before the 4,000-Hour Service

Kyle Weaver served as captain of the Vessel at the time of the Incident.  Transcript of Deposition of Kyle Weaver ("Weaver"), 88:19-24.   Weaver worked on the Vessel for approximately five years prior to the Incident.  Weaver, 132:20-133:1.  His marine experience includes: (1) working for 30 years as a captain; (2) attending shipboard firefighting school; (3) serving as a water safety officer in the U.S. Marine Corps; and (4) holding a 100-ton rating captain's license since 2005. Weaver, 15:4-14.  As captain, Weaver's responsibilities included ensuring the safety of the vessel and of the passengers, provisioning the vessel for voyages, cooking for and entertaining the guests, and keeping the boat clean and maintained. Weaver, 9:13-10:4.

When the Vessel had reached just over 4,000 engine hours, Weaver recommended to Finger that he hire a mechanic to complete the 4,000-hour service recommended by the Vessel's manual. Weaver, 136:21-137:5.   The engines were performing normally prior to the service. Weaver, 137:6-8.  Weaver had previously contracted with Defendant for service on the Vessel. Weaver, 137:11-21.  In fact, after the Vessel's purchase, Defendant was the only mechanic who had worked on the Vessel's main engines. Weaver, 60:11-15.  Therefore, Weaver contacted Defendant to perform the 4,000-hour service and "whatever else was required to be done to the vessel at that time." Weaver, 60:7-9, 64:10-12.

b.      The 4,000-Hour Service

Defendant commenced the 4,000-hour service in the fall of 2021. Weaver, 64:25-65:2. However, due to COVID-19, parts were not available, so the Vessel's turbochargers were not serviced until fall of 2022. Weaver, 65:3-12.  Weaver testified that he and Mate Drew Buckland took photographs of the engine room during the service to prove that Defendant's mechanics were on the Vessel and doing work, should his boss ask him. Weaver, 65:13-25.

Weaver testified that while the 4,000-hour service was being performed, he saw that the outboard exhaust hose "was off and pushed off and not in the normal, secure place that it normally is." Weaver, 79:16-81:14.  Weaver also testified that he received pictures from Buckland showing the hose pushed back during the later work done on the turbochargers. Weaver, 81:9-14.  He described one photograph—Trial Exhibit 74—as depicting the outboard riser missing its support, a structure that "keeps th[e] hoses from getting pinched or compromised." Weaver, 209:22-212:9.



During the work on the turbochargers, Logan Marine told Weaver that the upper exhaust hose was leaking and needed to be replaced. Weaver, 261:21-262:6.  Weaver suggested that this may be connected to the missing support:

> [W]hat I am saying there is, if you look, as I mentioned before, that they had the riser off, and those two hoses are supporting the entire riser and the exhaust tubes without any proper support. Therefore, in my honest [sic] -- they compromised the hose because they pushed it back away from the engine. Those hoses aren't designed to go that direction. So they pushed that hose back and made it get out of the way. And that's probably why they had to replace the upper hose -- is -- they couldn't get it to seal anymore because it was it was compromised. They tried to push that hose out of the way, and it was supporting the risers.

Weaver, 218:20-219:8.  However, Weaver also acknowledged that he did not ultimately know why Defendant replaced the hose. Weaver, 263:16-19.

On November 14, 2022, a sea trial was performed, with Weaver, Buckland, Logan, and Kellogg in attendance. Weaver, 154:13-22.  After that sea trial, Defendant changed out a wiring harness and coolant. Weaver, 155:16-23.  A second sea trial occurred after December 7, 2022. Weaver, 155:6-23.  After the second sea trial, Defendant performed more work on the Vessel, changing the thermostats. Weaver, 247:9-23.  The Vessel was used only once—to take on fuel— between the last sea trial and December 28, 2022, and there were no problems at that time. Weaver, 90:1-12.  After all work was completed, Weaver asked Defendant for permission to operate the Vessel, calling to make sure the Vessel was "good to go" for the trip to the Bahamas. Weaver, 246:24-247:8.  Weaver testified that he "wanted to make sure the boat was seaworthy" before the trip. Weaver, 248:2-5.

As to his own maintenance duties, Weaver explained that it was his practice to check the engine room daily for visible leaks, fluid levels, transmission, generators, and otherwise for anything else that was amiss. Weaver, 70:14-71:24.  If they were visible, Weaver would inspect the cooling exhaust hoses. Weaver, 71:9-12.  When asked whether he or anyone else inspected the engines to ensure that the work done by Defendant was performed properly, Weaver stated that he "leave[s] that up to the mechanics [he] hire[s]," as they are the professionals. Weaver, 70:6-9.  He explained further:

As I stated, I am not the professional. I do my daily engine room checks, which is basic minor engine room checks. I cannot be the professional to say that the work was completed, other than we did a sea trial with Logan Marine. And I went off there [sic] saying that the work was good to go, and the boat was safe to use.

Weaver, 70:19-25. On the night of December 27, 2022, Weaver arrived on the Vessel and performed his basic inspections. Weaver, 89:6-15. Weaver did not notice any engine room issues, noting that the bilges were dry and that the fluids were okay. Weaver, 89:6-19. On December 28, 2022, the Vessel left for the Bahamas. Weaver, 88:19-21.

      c.    The Incident

On December 31, 2022, while at sea, the Vessel became sluggish, and Weaver went to the engine room to inspect. Weaver, 86:24-88:02, 174:19-23. No alarms sounded. Weaver, 87:24-88:4. As soon as Weaver realized the engine room was flooded, he made all passengers get on the bridge with life jackets, pulled out a life raft, and made a mayday call. Weaver, 176:10-18, 178:19-23. Weaver instructed Finger to drive the boat. Weaver, 176:7-8. Weaver then went back down to the engine room to activate the crash pumps. Weaver, 176:16-19.

As Weaver was trying to open one of the crash pump valves in the flooded room, he noticed cool water. Weaver, 176:20-21. Buckland, who was watching Weaver work, pointed to the side of the room, showing Weaver that a hose had come off. Weaver, 176:21-24. Weaver then directed that the port engine be shut down, which Finger eventually did. Weaver, 176:25-177:4. Meanwhile, the starboard crash pumps enabled the starboard engine to suck water out of the engine room. Weaver, 174:24-176:2, 177:2-4.

After approximately 45 minutes, the crash pumps had removed enough water from the engine room to allow Weaver to swim to the port engine and figure out which hose had come off. Weaver, 177:22-178:9. Weaver identified the separated hose as the port outboard lower raw water intake hose and noticed a broken hose clamp dangling on the hose. Weaver, 180:17-181:1, 51:18-52:2. The broken hose clamp was about eight to ten inches below where it was supposed to be,

where the hose attaches to the riser. Weaver, 52:21-53:2. Weaver noted that the broken clamp had no visible signs of corrosion but to his knowledge was manufactured in 2007. Weaver, 135:13-25, 53:12-13. He saw two other hose clamps on the other end of the hose (at the bottom of the hose), where the hose comes off the raw water pipe. Weaver, 52:10-20. All three clamps were T-bolt style clamps. Weaver, 53:6-11.

Weaver also noticed that while the lower hose had only three hose clamps, there were five hose clamps on the upper hose. Weaver, 124:7-8. Each hose is supposed to have two clamps on each end. Weaver, 125:17-20. Weaver testified that there was a fifth clamp in the middle of the upper hose, as depicted in a photograph "taken immediately" after the Vessel was secured. Weaver, 221:13-23. Weaver stated that the photograph—Trial Exhibit 75.2—taken by Buckland showed Weaver's arm pointing to the extra clamp "in a wrong position." Weaver, 221:24-222:11.



Weaver testified that the extra clamp did not have any purpose to his knowledge where it was found. Weaver, 222:12-14. Instead, he testified that the clamp should have been used on the lower

hose. <u>Weaver</u>, 120:19-25.  Weaver noted that the extra hose clamp was of a different, newer style than the rest of the clamps. <u>Weaver</u>, 123:13-18.  However, he clarified that this was not the reason for the clamp failure, as the failure was on the lower hose. <u>Weaver</u>, 124:1-6.  Weaver used the extra hose clamp, as well as a spare clamp likely from his spare parts bin, to secure the lower hose. <u>Weaver</u>, 126:10-25.  After attaching the lower hose, Weaver tightened all the other hose clamps, finding them loose. <u>Weaver</u>, 222:23-223:22.  The Vessel then headed for the dock. <u>Weaver</u>, 178:10-13.

Weaver also testified that during the dewatering process, any items floating around that could have blocked the crash pumps were thrown overboard. <u>Weaver</u>, 172:2-173:8.  One of the items thrown overboard or destroyed by the engine room flooding was a spiral-bound notebook containing Weaver's personal maintenance logs of the Vessel. <u>Weaver</u>, 30:8 – 32:1, 171:17-172:23.  Weaver testified that he did not keep an official vessel log as there is no requirement for keeping one on that size of vessel. <u>Weaver</u>, 32:2-16.

When asked why no one from ½ Barrell, LLC discovered that there was only one hose clamp installed on the lower hose, Weaver stated that "[i]t's in a spot that's almost impossible to inspect," as "[y]ou have to climb around outside of the engine and lay on your back and look up." <u>Weaver</u>, 80:2-11.  When asked whether it was his job to ensure that the hose clamps were inspected regularly, Weaver answered: "It's my job to hire mechanics that should do that. It's my job, if I do see a leak, to fix the leak. I'm not a hose clamp expert." <u>Weaver</u>, 80:12-17.

Weaver called Plaintiff, the Vessel's insurance company, on the day of the Incident. <u>Weaver</u>, 114:3-13.  After the incident, the Vessel remained in the Bahamas roughly around 24 hours before returning to Florida under her own power. <u>Weaver</u>, 106:21-107:11.  The Vessel arrived at Willis Custom Yachts in Stuart, Florida, on January 3, 2023. <u>Weaver</u>, 107:12-14, 108:24-109:10.  Around the same time, Stewart Hutcheson was appointed to conduct the insurance

investigation and spoke with Weaver. <u>Weaver</u>, 115:1-11.  Weaver coordinated with Hutcheson to find problems and approve the necessary repairs to get them done through insurance. <u>Weaver</u>, 243:9-16.  Estimates for repairs to the engine room were obtained from several companies and passed on to Hutcheson. <u>Weaver</u>, 243:15 – 244:07.

> ii.   *Testimony of Esmond Logan*

The Court heard testimony from Esmond Logan, the owner of Logan Marine, during the trial.  Below is relevant testimony from the witness.

> a.   <u>Before the 4,000-Hour Service</u>

Esmond Logan ("Logan") is the owner of Defendant Logan Marine & Industrial Diesel LLC; he started the company approximately 12 years ago. Tr. Vol. 1, 25:14-18.  Logan first began working on diesel engines over 40 years ago, when he was 17 years old. Tr. Vol. 1, 24:4-11.  He started receiving training on diesel engines over 30 years ago, has worked for several diesel engine companies, and holds about fifty to sixty mechanic certifications, including those for MTU engines. Tr. Vol. 1, 24:12-14, 26:2-28:11.  He met Don Kellogg, another witness in this case, while working for Florida Detroit Diesel ("Florida Detroit"). Tr. Vol. 1, 26:7-10.  They worked together at Florida Detroit for 15 years before Logan started Logan Marine. Tr. Vol. 1, 26:2-6.  By about a year later, Kellogg joined Logan, and the two "did most jobs together." Tr. Vol. 1, 26:4-6.

> b.   <u>The 4,000-Hour Service</u>

Logan testified that Defendant commenced work on the Vessel's 4,000-hour service on November 9, 2021, after Finger signed off on the proposal. Tr. Vol. 1, 62:19-23, 66:4-13.  During the service, Defendant identified issues with the turbochargers and recommended they be rebuilt. Tr. Vol. 1, 66:20-25, 73:9-11. Due to unavailability of parts, work on the turbochargers only commenced in August 2022. Tr. Vol. 1, 33:22-34:11, 36:21-23.

When turbochargers need servicing, Defendant removes a vessel's turbochargers and sends them to a subcontractor. Tr. Vol. 1, 37:23-38:5.  Once the serviced turbochargers are sent back, Defendant inspects them again before installation. Tr. Vol. 1, 38:6-15.  In this case, Logan testified that Defendant sent the turbochargers to be reconditioned by Atlantic Turbos, Inc., which ostensibly reconditioned them and shipped them back to Defendant. Tr. Vol. 1, 67:24-68:21.  On the Vessel, each turbocharger is secured by several bolts attached to the engine's exhaust manifold and air flow. Tr. Vol. 1, 73:12-74:8, 77:18-25.  Logan testified that the turbochargers are "pretty heavy." Tr. Vol. 1, 78:8-9.  While "[s]ome people might" need two people to move a turbocharger around in an engine room, Logan testified that he can do it himself. Tr. Vol. 1, 78:12-18.

Logan testified that to remove the turbochargers one did not have to remove the exhaust hoses. Tr. Vol. 1, 39:15-18.  In fact, he stated that the idea one did have to remove the exhaust hoses was "pretty baffling," as the exhaust hoses carry raw salt water, but the water going through the turbocharger is fresh water, acting as a coolant. Tr. Vol. 1, 39:15-24.  He stated:

> The hoses that we are talking about has [sic] nothing to do with the turbo charger, and even the size of the engine room, it means nothing. The only hoses that come to [the turbocharger] is [sic] coolant hoses, and we take the turbo chargers [sic] off every day, and not move the raw water hoses. There is no reason for it.

Tr. Vol 1, 39:25-40:5.  During his testimony, Logan described Trial Exhibit 87.20 as a photograph showing the turbocharger removed from the engine with the upper hose on the port outboard side still attached.  Tr. Vol. 1, 44:9-47:12; DE 72-86 at 20.



Case 22-CV-80628 ROSENBERG
**EXHIBIT**
**DEFENDANT 87.20**

During service on the turbochargers, Logan noticed corrosion on the outboard port upper raw water hose and its hose clamps. Tr. Vol. 1, 47:9-48:8, 50:23-53:2.  On or about October 11, 2022, Defendant purchased an exhaust hose from Hydraulic Supply Company. Tr. Vol. 1, 64:2-20.  Defendant thereafter replaced the upper exhaust hose. Tr. Vol. 1, 47:9-12.  Logan testified that

when the hose was installed it had "a very slight kink on it"; therefore, when attaching the hose, Defendant attached two clamps on the riser side, two clamps on the other side, and a fifth hose clamp on the area with the kink. Tr. Vol. 1, 48:21-50:4.  Notably, Logan testified that he never removed the lower exhaust hose from the Vessel's port outboard riser, as there was no reason to do so. Tr. Vol. 1, 47:13-14.

  c. <u>After the Incident</u>

  Logan testified that when he and Kellogg went aboard the Vessel after the Incident, Weaver pointed and told Logan that the lower exhaust hose had come off the side of the hose connected to the Y-pipe, which is the opposite side from that connected to the riser. Tr. Vol. 1, 55:13-18.  Logan reiterated this comment later in his testimony.[2] Tr. Vol. 1, 59:1-4, 87:12-14.

  *iii.* *Testimony of Don Kellogg*

  Next, the Court heard from Don Kellogg, who serviced the Vessel alongside Esmond Logan.

  Kellogg testified that he worked for Florida Detroit for just under 30 years and has been a self-employed consultant for about two or three years, providing technical support and troubleshooting for diesel engines. Tr. Vol. 1, 96:2-9.  He periodically works with Logan. Tr. Vol. 1, 96:10-16.  He has approximately 40 certifications relating to his profession, including certifications for MTU engines. Tr. Vol. 1, 96:17-22.  Kellogg testified that he got involved with service on the Vessel once turbocharger service began, after Logan asked him if he could give him a hand. Tr. Vol. 1, 98:21-99:1.

---

[2] However, the Court notes that at the end of trial, the Court asked Defense Counsel to clarify this point, asking whether Defense Counsel agreed at that point that the hose disconnected at the riser, *not* the Y-pipe. Tr. Vol. 2, 78:15-16.  Defense Counsel agreed. Tr. Vol. 2, 78:17.  The Court concludes that Logan was simply mistaken and that this testimony does not undermine his credibility as to the germane issue in this case.

Kellogg testified that he did not remove any hose on the Vessel during the turbocharger service, as the raw water exhaust hoses did not need to be removed to take off the turbochargers. Tr. Vol. 1, 99:25-100:5.  However, Kellogg testified that he did replace the upper hose on the outboard side of the port engine at Logan's direction, as it was leaking and had noticeable corrosion. Tr. Vol. 1, 102:2-9, 108:7-10, 109:1-2.  When he installed the new upper hose, Kellogg secured the hose with two clamps on each side. Tr. Vol. 1, 104:4-6.  He also placed an extra hose clamp on the new exhaust hose, to "take out the kink or . . . deformity in the hose." Tr. Vol. 1, 104:7-9.  But Kellogg also suggested that the clamp was not necessary, as the water going through the hose would have straightened out the kink anyway. Tr. Vol. 1, 111:7-11.  When installing the upper hose, Kellogg did not look at the lower hose. Tr. Vol. 1, 110:2-4.  In fact, when asked if he ever removed the lower exhaust hose on the Vessel, Kellogg responded that he "[n]ever touched it." Tr. Vol. 1, 104:18-19.

C.      **Expert Testimony About the Incident**

Plaintiff called two expert witnesses to the stand: Christopher Pliske and Stewart Hutcheson.  Both witnesses are marine surveyors.  Pliske testified as to cause of loss, while Hutcheson testified as to both cause of loss and damages.

i.      *Testimony of Christopher Pliske*

The Court first heard from Christopher Pliske, one of Plaintiff's expert marine surveyors.

a.      Experience and Methodology

Pliske is a marine surveyor at Pliske Marine, Inc. in Fort Lauderdale, Florida. Tr. Vol. 1, 112:19-23.  He served in the U.S. Navy for six years, where he went to engineering school and worked as a machinist mate, removing and reinstalling engine components. Tr. Vol. 1, 113:1-114:15.  After leaving the Navy in December 2003, he worked as an engineer on a private yacht, maintaining all of the equipment in the engine room and performing all maintenance tasks. Tr.

Vol. 1, 115:3-10.  At the time, he was licensed through the U.S. Coast Guard as a "second engineer, all oceans, chief engineer limited." Tr. Vol. 1, 115:15-23.  Pliske now runs the daily operations of Pliske Marine. Tr. Vol. 1, 117:2-11.  He has performed around 3500 surveys, including 110 surveys of Viking-made vessels of different sizes. Tr. Vol. 1, 117:12-13, 120:12-17.

Pliske testified that he has experience with the maintenance of turbochargers. Tr. Vol. 1, 116:7-10.  He has previously removed turbochargers from vessels to have them rebuilt. Tr. Vol. 1, 128:15-22.  In the Navy, he mostly worked on steam-powered equipment, but that included bilge pumps and engine room hoses with clamps. Tr. Vol. 1, 114:16-115:2.  He also has experience as a surveyor inspecting raw water hoses.  Tr. Vol. 1, 119:7.  When inspecting raw water hoses, Pliske stated that he looks for corrosion, specifically on the hose clamps, and ensures that the hoses are double clamped, as "[i]t is an industry standard." Tr. Vol. 1, 119:9-15.  He also looks for cracking and other signs of stress on hose clamps. Tr. Vol. 1, 119:22-120:3.

In the instant case, Finger called Pliske to survey the Vessel after the Incident. Tr. Vol. 1, 121:10-20.  Pliske was "asked to, on behalf of the owner, inspect and document the damage, . . . basically representing him and his insurance claim separate from the adjustor." Tr. Vol. 1, 121:17-20.  Pliske described his typical methodology as follows:

> Usually in this -- what I do in this situation is, I interview the captain and crew in regards to the incident, and then once I have documented all of that, I will go do a visual inspection, document -- you know, in this case I marked out the level of the flooding, and I just inspected the engine room and documented everything that would have been affected by the sea water flooding.

Tr. Vol. 1, 121:23-122:4.  He testified that he followed this procedure in the instant case. Tr. Vol. 1, 122:5-6.

      b.    <u>Opinions as to the Incident</u>

Pliske testified that based on his interview with Weaver, he learned that an exhaust cooling hose had come loose on the riser and had pumped water into the engine room. Tr. Vol. 1, 122:7-11.  He then visually inspected the engine room of the Vessel. Tr. Vol. 1, 123:9-24.

Pliske testified that he was familiar with how a turbocharger is connected to an MTU engine. Tr. Vol. 1, 123:13-21.  According to Pliske, to disconnect a turbocharger, one would need to unbolt the riser, base, and flange at the exhaust manifold, remove the air filter and its hose, and disconnect the oil line before the turbocharger is lifted up and out from the engine. Tr. Vol. 1, 123:22-124:6.  When asked how much a turbocharger such as the one on the Vessel weighs, Pliske stated, "I have been told 75 to 80 pounds." Tr. Vol. 1, 124:7-9.

During the trial, Plaintiff's Counsel showed Pliske Trial Exhibit 73, a photo of the turbocharger and two exhaust hoses to the right of the turbocharger. Tr. Vol. 1, 125:22-126:4; DE 72-73.



Pliske testified that, from his observation of the photograph, the hoses are about three or four inches from the turbochager. Tr. Vol. 1, 125:25-126:4.  Pliske was then shown Trial Exhibit 72, another photograph of the outboard side of the port engine, depicting a box with a grill to the right of the two exhaust hoses. Tr. Vol. 1, 126:5-10; DE 72-72.



Pliske testified that, from his observation of the photograph, there are about 10 inches of clearance between the box and the hoses. Tr. Vol. 1, 126:5-15.

When asked whether it was his opinion if one or both hoses must be removed to work on a turbocharger, Pliske stated that "it would make it considerably easier." Tr. Vol. 1, 126:16-20. He based his opinion, in part, on the knowledge and experience of Nathan Irons from Marine Diesel Specialists, whom he called while on the Vessel. Tr. Vol. 1, 132:6-133:10.  When asked what it would require to remove the turbocharger, Irons "backed up [Pliske's] opinion" that "if

[he] was tasked to do this work, that [he] would remove those hoses so that [he] had better access for disassembly in handling of the turbo." Tr. Vol. 1, 133:13-18, 137:16-19.

On cross, Pliske reaffirmed his position in the following exchange:

Q.      Do you know if it was necessary to move hoses out of the way or other things out of the way to get to the turbos?

A.      Not necessary, but it would have made it extremely difficult for handling. That is my opinion.
….

Q.      I think you also said -- I think the other time you said it would be considerably easier to work on it if we removed some of the hoses?

A.      Yes, because you are not only talking about physically removing the hoses so that you have better access to the turbo charger, you have to imagine that this is a spot, and I am a particularly tall guy, that you can't really stand up in. You are pretty much hunched over and squatting the whole time.

Q.      It is harder to do it?

A.      Yes, it is much harder.

Tr. Vol. 1, 141:11-142:6 (emphasis added).  However, Pliske does not know if the lower exhaust hose was actually removed during the turbocharger service in this case. Tr. Vol. 1, 142:16-19.

Later, Pliske had the following exchange with the Court to clarify his opinion, as his declaration stated that it was "necessary" to remove the hoses, while his in-court testimony was that it was "helpful":

THE COURT:          But here in court I think you said that -- let's see, I was taking my notes -- that it would have been necessary -- it would not be necessary, but it would have been helpful. And I suppose I am trying to understand if there is a difference in terms of what you are saying today versus what is in the declaration.

Is it a matter of it being necessary and required or -- in other words, it would be impossible to remove the chargers without removing the hoses, or is it what I thought I heard you say here today, it would be helpful, it would make things easier to do it?

> THE WITNESS:     It wouldn't be impossible, but in my opinion, it would be
> extremely difficult to have the leverage in the position that I
> would have to be in to be able to lift that turbo up, out, and
> over those houses so I can maneuver it around the outboard
> side of the engine. That is 75 to 80 pounds.

Tr. Vol. 1, 151:15-152:6.  He also clarified that he has not removed a turbocharger on these types

of engines before, only on other models. Tr. Vol. 1, 152:7-14.

Pliske also addressed the lack of maintenance records on the Vessel, stating that in his

experience, "on boats of this size, there are often not maintenance records." Tr. Vol. 1, 145:8-9.

He did not think it was important to see those records, and he did not expect the boat to have those

records. Tr. Vol. 1, 145:3-14.  Instead, he stated that he "could visually tell pretty much what kind

of care was taken on the boat, it was in good shape." Tr. Vol. 1, 145:6-7.

ii.     *Testimony of Stewart Hutcheson*

Next, the Court heard testimony by Zoom from Stewart Hutcheson, another surveyor and

expert witness for the Plaintiff.

a.     <u>Experience and Methodology</u>

Hutcheson has been a marine surveyor for over 35 years and is currently the senior marine

surveyor at Harbor and Ocean Services. Tr. Vol. 2, 5:16-24.  He has specialized in casualty and

loss since 1989. Tr. Vol. 2, 8:17-20.  Generally, the scope of his assignments is to establish the

cause of a loss, the extent of damage, and the likely repair cost. Tr. Vol. 2, 9:1-3.  His experience

with marine engines ranges from cargo ships to outboard engines. Tr. Vol. 2, 9:15-19.  Hutcheson

has testified in front of federal and state courts several times and given dozens of depositions. Tr.

Vol. 2, 11:10-21.

Hutcheson testified that he has determined the cause of loss for "[e]verything from 17-foot

vessels to . . . 400-foot vessels."  Tr. Vol. 2, 10:2-5.  Hutcheson testified that he does not use a

specific methodology determining cause of loss beyond "examin[ing] all probable or likely cause

[sic], and then examin[ing] the most unlikely." Tr. Vol. 2, 10:15-19.  In cases where a pleasure boat's engine room was flooded, Hutcheson states that "[g]enerally you are going to arrive at the cause, so there isn't any specific methodology because each point is different, but there are likely suspects, and engine plumbing, or any plumbing that leads through the vessel and feeds or expels raw water are one of the primary suspects." Tr. Vol. 2, 10:10-24.

Hutcheson also testified that he has determined the damages due to a pleasure boat's engine being flooded several hundred times. Tr. Vol 2, 10:10-14.  However, Hutcheson emphasized that his surveying is distinct from adjusting, which requires a license. Tr. Vol. 2, 10:10-24.  He described his job as follows: "[A]ll I do is make recommendations.  I will read estimates or invoices and establish whether those line items are, in fact, loss related and fair and reasonable and make comment on that to the adjustor." Tr. Vol. 2, 11:3-6.  Consequently, Hutcheson is familiar with the prices charged by South Florida area local ship repair yards and ship repairing companies. Tr. Vol. 2, 12:10-14.

In the instant case, on January 3, 2023, Hutcheson was assigned to survey the Vessel.[3] Tr. Vol. 2, 12:17-13:7.  On January 9, 2023, Hutcheson arrived at Willis Custom Yachts in Stuart, Florida, going aboard the Vessel to determine the cause and origin of the engine room flooding and to determine the extent of the damage. Tr. Vol. 2, 13:3-19.  Hutcheson interviewed Weaver to "establish the timeline and the origin[] and determine whether he had worked on the boat or not." Tr. Vol. 2, 13:20-24.

b.    Hutcheson's Opinions on the Cause of Loss

On or about January 10, 2023, Hutcheson issued his First Report, which was introduced as Exhibit 78 at trial. Tr. Vol. 2, 14:9-12, DE 72-78 at 1. The First Report summarizes Weaver's statements to Hutcheson, which included the following: (1) "[h]e and the crew traced the inflow

_____

[3] At the time, Hutcheson was reporting to an adjustor at AIG, indirectly reporting to Plaintiff. Tr. Vol. 2, 12:17-23-2.

to the detached raw water discharge hose on the outboard side of the port main engine"; and (2) "[h]e removed a hose clamp from the secondary flexible hose[ and] re-attached the displaced hose." DE 72-78 at 2.  Based on his interview of Weaver, as well as his own inspection of the exposed hose fittings, Hutcheson concluded that the lower hose that fed water to the exhaust riser had become detached, "allow[ing] a substantial amount of water in a short space of time to ingress the boat." Tr. Vol. 2, 15:16-20, 26:14-23.  Therefore, Hutcheson's professional opinion is that the lower hose's detachment is the cause of loss. Tr. Vol. 2, 29:22-30:4.

Hutcheson also opined on the reason that the lower hose failed in his report and at trial. Hutcheson's First Report states that: (1) "[t]here was only one clamp holding the flexible raw water hose to the nipple of the exhaust riser at the time of loss"; (2) "[t]hat clamp corroded and failed under tension." DE 72-78 at 7.  However, during trial, when asked about the basis for this opinion, Hutcheson clarified: "I believe at the time of loss there were two hose clamps, one of which being the degraded and aged clamp that failed." Tr. Vol. 2, 41:19-42:6.

Hutcheson also ultimately opined that Defendant was at fault for the faulty hose clamp and the Incident for the following reasons.  First, Hutcheson testified that, in his opinion, the exhaust hoses need to be removed to work on the turbocharger, as in the following exchange at trial with Plaintiff's Counsel:

> Q.   So, if one wanted to remove the turbo charger, are you familiar with what would have to be done?
>
> A.   You would have to uncouple it from the riser and from the engine. So you have the exhaust out of the engine and then the turbo takes the air and then compresses it and feeds it back to the engine, but the turbo itself is attached to the exhaust, and the other end of the turbo, the housing of the turbo, is fastened to the engine. It is not a flexible item. In order to remove the turbo charger you would have to uncouple the exhaust system, or that exhaust riser, being that that is not flexible.
>
> Q.   And when you uncouple that, what happens to the two exhaust hoses?

> A.     You would have to detach them. You can't get to that riser without
> detaching the two flexible hoses feeding that riser.
>
> Q.     Is that something that you observed in this engine room?
>
> A.     I didn't detach or make any removal of the turbo charger, but I observed
> that that would be the only plausible or possible way to remove the turbo.

Tr. Vol. 2, 29:3-21.  However, on cross-examination, Hutcheson testified that this opinion was

based only on the following information: his visual inspection of the boat after the Incident,

invoices from Defendant stating that the turbochargers had been removed, and Hutcheson's

conversation with Weaver. Tr. Vol. 2, 42:7-43:2.  Hutcheson then had the following exchange with

Defense Counsel:

> Q.     Agreed, but your testimony was that they had to remove those hoses?
>
> A.     Correct. They would have to have removed or uncoupled those hoses from
> the fixed riser in order to remove the turbo charger.
>
> Q.     And what do you base that on?
>
> A.     On the observation of the location of the turbo charger and what it is affixed
> to and what it is attached to.
>
> . . . .
>
> Q.     The riser is not moving, the turbos are taken off of it. If the riser is not being
> moved, don't they just take – the riser is in the back, the turbo is in the front.
> Don't they just take the turbo off the front and remove it?
>
> A.     No.
>
> Q.     You are saying no. Do you have any certificates, worked on MTU engines
> coming into Florida Detroit Diesel?
>
> A.     No, I don't have any certification from MTU or FDDA, or whatever, but I
> have seen numerous turbo chargers being removed from MTU engines.
>
> Q.     In this particular case, did you interview anyone who had seen it being
> removed?
>
> A.     Only the captain.
>
> Q.     Did the captain tell you those hoses were removed?

A.     The captain told me the turbo had been removed.

Q.     Different thing. Did you see any photos of the turbo being removed?

A.     No, I did not.

Q.     You mentioned Logan Marine removed the turbos, and I believe your words were, in your investigation you try and talk to everybody. Did you ever talk to any of the mechanics who removed that specific turbo?

A.     No, I did not.

Q.     Did you inquire -- did you ask for any, again, photos, invoice, anything showing that they removed those hoses?

A.     No, I did not.

Tr. Vol. 2, 43:3-5:3.

Hutcheson's First Report included the following opinion based on his belief that Logan

Marine removed both hoses:

> * It is most likely and my professional opinion that when Logan Marine uncoupled the four 3-inch hose clamps from the two hoses attached to the exhaust riser, they placed all four on one hose so as not to loose [sic] them. Then when they re-attached the flexible hoses instead of employing two hose clamps per hose they only used one on the lower hose and two on the upper hose but left the unused clamp on the upper hose.

DE 72-78 at 7 (emphasis added).  Hutcheson opined in his First Report that had Defendant installed

either one or two "properly fastened" clamps on the lower hose, the loss would not have happened.

*Id.*  He also opined that "had Logan Marine inspected the torque hose clamps they would have

noted the open and obvious pitting and corrosion and should have replaced said hose clamps." *Id.*

c.     Hutcheson's Opinions on Damages

Based on his observations, Hutcheson prepared a scope of repair, which was contained in

his First Report. Tr. Vol. 2, 15:24-16:7; DE 72-78 at 14.  Based on his prior experience and his

inspection of the engine room, Hutcheson made a field estimate that his recommended repairs

would be at least $240,000.00. Tr. Vol. 2, 30:8-12.  He subsequently received estimates for his

recommended repairs from the insured so that both Hutcheson and ½ Barrell, LLC could arrive at an agreed cost of repair. Tr. Vol. 2, 30:13-23.  After he received estimates, he began to receive and review invoices for the work that was done. Tr. Vol. 2, 31:6-11.  Hutcheson testified that the amounts on the invoices received were in line with prices charged by other similar vessel repairers in South Florida. Tr. Vol. 2, 34:1-6.  Furthermore, Hutcheson testified that he amended the invoices to clarify the total of loss-related work. Tr. Vol. 2, 34:7-19.  Hutcheson stated that the total amount he recommended in his final report was $270,527.00.  Tr. Vol. 2, 35:9-17.

## II.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court first reviews the applicable law in this case before turning to the parties' theories of the case.  Finally, the Court makes its findings of fact and conclusions of law.

### A.  <u>Applicable Law</u>

This is an admiralty and maritime claim for damages to a vessel arising out of breach of a ship repair contract, breach of the warranty of workmanlike performance, and negligence. DE 7 at 5-6.  A contract to repair a vessel provides a basis for admiralty jurisdiction. *Diesel "Repower," Inc. v. Islander Invs. Ltd.*, 271 F.3d 1318, 1322-23 (11th Cir. 2001).  Therefore, the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1333 and Federal Rule of Civil Procedure 9(h).

During bench trials, the judge serves as the sole factfinder, assuming the role of the jury. *Am. Marine Tech., Inc., v. M/Y Alchemist*, 526 F. Supp. 3d 1236, 1246 (S.D. Fla. 2021). Therefore, "it is the exclusive province of the judge in non-jury trials to assess the credibility of witnesses and to assign weight to their testimony." *Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir. 1993).  "The burden of proof in civil cases is the same regardless of whether the finder of fact is a judge in a bench trial or a jury." *Am. Marine Tech., Inc.*, 526 F. Supp. 3d at 1245.  That burden requires the parties to prove each element of their claims by a preponderance of the evidence. *Id.*

"A preponderance of the evidence is evidence which is more convincing than the evidence offered in opposition to it." *U.S. v. Watkins*, 10 F.4th 1179, 1184 (11th Cir. 2021) (quoting *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997)).  In other words, the standard requires a showing that a proposition "is more likely true than not true." *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F. 4th 1278, 1328 (11th Cir. 2022).  Although not toothless, preponderance of the evidence is not a high standard of proof. *U.S. v. Askew*, 193 F.3d 1181, 1183 (11th Cir. 1999).  In meeting this standard, courts "treat circumstantial evidence the same as direct evidence." *Carrizosa*, 47 F.4th at 1329.

### B.      The Parties' Theories of the Case

Plaintiff argues that its circumstantial evidence presented establishes by a preponderance of the evidence that Defendant was responsible for the flooding of the engine room, breaching its contract, breaching the warranty of workmanlike performance, and acting negligently. *See* DE 79-1 at 29.  Plaintiff's theory is that (1) when removing and reinstalling the turbochargers, Defendant disconnected and moved the exhaust hoses; (2) Defendant failed to double clamp the lower exhaust hose after the service; and (3) the engine room flooded as a result of the single clamping. *See id.* at 30.  The first prong of Plaintiff's theory is based on the assumption "that both exhaust hoses at the engine risers have to be moved in order to remove and reinstall the turbochargers." *Id.*  The second prong of Plaintiff's theory is based on the assumption that "the 'fifth' hose clamp on the upper exhaust hose was the one that was intended as the second hose clamp to the lower exhaust hose." *Id.*  Furthermore, Plaintiff's theory requires that the Court find Defendants' witnesses' testimony—that they did not touch the lower exhaust hose at any time—false. *See id.*

Defendant's theory is that "Plaintiff [has] failed to demonstrate by a preponderance of the evidence that there was a lack of due care by Logan that was either the actual cause or proximate cause of the sinking." DE 80 at 27.  Defendant argues that weight should be accorded to the

testimony of Logan and Kellogg, as they were the only two witnesses who actually worked on the engines. *See id.* at 20.  Defendant further argues that "no evidence was submitted establishing that the port lower exhaust hose leak was caused by Logan's service or repairs to the vessel" or that Logan Marine "improperly performed the repairs so as to breach the contract and cause the damage . . . alleged." *Id.* at 20, 23.

### C.  __The Court's Findings and Conclusions__

*i.   Findings of Fact*

After considering the testimony and documentary evidence, the Court makes the following findings of fact.

1.  Esmond Logan was a knowledgeable and credible witness.  He testified to his decades-long experience as a mechanic for diesel engines.  He holds certifications specifically for MTU engines and spoke with convincing expertise as to his work.  He unequivocally stated that in his experience as a mechanic, he takes turbochargers off "every day" without having to remove the raw water exhaust hoses; he testified accordingly that he did not remove the lower water exhaust hose in this case.  Logan's demeanor during his testimony contributed to his credibility.  For all these reasons, the Court finds that Logan was a credible witness.

2.  Donald Kellogg was a credible witness.  Kellogg similarly testified as to his decades of experience working on diesel engines and his dozens of certifications, including those for MTU engines.  Kellogg unequivocally stated that he did not remove any exhaust hoses as part of the turbocharger service.  Kellogg was the person who installed the new upper hose, and he testified that he placed an extra (fifth) clamp on the hose during this process.  Although Plaintiff attacked Kellogg's credibility by attempting to persuade the Court that this fifth hose clamp was meant to be the second clamp on the riser side of the lower exhaust hose, Plaintiff has no direct testimony supporting this contention.  Only Kellogg was present at the time the clamp was put on the hose.  Kellogg's demeanor during his testimony contributed to his credibility.  For all these reasons, the Court finds that Kellogg was a credible witness.

3.  Plaintiff's expert Christopher Pliske testified that while it would be "extremely difficult" to remove the turbochargers without removing the exhaust hoses, it was not impossible.  Because Pliske did not testify that it would be impossible, the Court is not persuaded that it should conclude that Logan and Kellogg were untruthful in their testimony.

4.     Unlike Pliske, Plaintiff's expert Stewart Hutcheson never conceded that it would be possible for the turbochargers to be removed without removing the exhaust hoses.  However, the Court is not persuaded by his testimony as to impossibility because Hutcheson admitted on cross-examination that his opinion was only based on his visual inspection of the boat and his general knowledge that the turbochargers had been removed.

5.     Because the Court finds the testimony of Logan and Kellogg to be persuasive and credible, and because Plaintiff has provided no convincing evidence to the contrary, the Court finds that Plaintiff has not established by a preponderance of the evidence that (1) both exhaust hoses had to be removed in order to remove and reinstall the turbochargers; and (2) the fifth hose clamp on the upper exhaust hose was the one that was intended as the second hose clamp to the lower exhaust hose.

6.     As Plaintiff's theory of the case relies on the Court finding for the Plaintiff on the two assumptions mentioned in (5), the Court does not find it "more likely than not" that Defendant removed the lower exhaust hoses.  Plaintiff has not met its burden.

ii.     *Conclusions of Law*

To recover damages on a claim for breach of contract to repair a vessel, a plaintiff must establish: (1) the terms of the contract, (2) a material breach of the contract, and (3) the reasonable value of the damages. *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1249 (11th Cir. 2005).  Plaintiff alleges that Defendant breached the parties' marine repair contract "by failing to properly perform the work for which it was contracted to perform." DE 7 at 5. Specifically, Plaintiff alleges that Defendant failed to properly reconnect the lower raw water hose after service was complete, using only one hose clamp. *Id.*

As the Court has found that Plaintiff has not established that it is "more likely than not" that the Defendant failed to properly reconnect the lower raw water hose—or that the Defendant removed the lower raw water hose at all—the Plaintiff has not demonstrated a breach of contract.

Plaintiff's claims of breach of the warranty of workmanlike performance and negligence fail for the same reason.[4]

### III.    CONCLUSION

For all of the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that:

1.    Plaintiff New Hampshire Insurance Company is not entitled to judgment in its favor on its claims for breach of contract, breach of the warranty of workmanlike performance, and negligence.

2.    Final judgment will be entered in favor of Defendant in a separate order.

3.    Defendant shall e-mail a proposed final judgment to the Court in Microsoft Word format to rosenberg@flsd.uscourts.gov within three business days of the date of rendition of this Order.

3.    The Clerk of Court is directed to **CLOSE THIS CASE**.

**DONE AND ORDERED** in Chambers, West Palm Beach, Florida, this 13th day of August, 2024.

Robin L. Rosenberg
United States District Judge

Copies furnished to all counsel of record.

---

[4] "The implied warranty of workmanlike performance parallels a negligence standard." *Arnold v. Heritage Enters. of St. Lucie, LLC*, No. 13-14447-CIV, 2015 WL 10791990, at *7 (S.D. Fla. May 8, 2015).  To establish negligence, a plaintiff must show "(1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) the plaintiff suffered actual harm." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012). Here, Plaintiff has not demonstrated by a preponderance of the evidence that Defendant took any action that caused the flooding of the Vessel.